IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL CONEY, et al.,           :           CIVIL ACTION
    Plaintiffs,                      :
                            :
    v.                               :
                            :
NPR, INC.,                        :
    Defendant.                       :           NO. 03-1324

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE                                  August 31, 2007
UNITED STATES MAGISTRATE JUDGE

Before the court are Plaintiff's[1] Motion for a New Trial (Doc. 139), Defendant's Response (Doc. 140), Plaintiff's Supplemental Motion for a New Trial (Doc. 151), Plaintiff's Memorandum in Support of its Motion for a New Trial (Doc. 152), Defendant's Response (Doc. 153), Plaintiff's Reply (Doc. 154), and Defendant's Sur Reply. (Doc. 155). For the reasons set forth below, plaintiff's motion and supplemental motion for a new trial are **DENIED.**

## I. BACKGROUND

This maritime personal injury claim was tried to an eight person jury from September 13, 2006 through September 22, 2006. At trial, plaintiff Michael Coney ("Coney"), claimed that on June 15, 2001 he was permanently injured while working as a longshoreman preparing to unload containers from defendant's vessel, the S.S. Humacao. Plaintiff alleged that his injuries occurred

---

[1] Michael Coney is the principal plaintiff and injured party in this case. The second plaintiff, Theresa Coney, Michael's wife, appeared only in one count, where she articulated a loss of consortium claim. None of the issues raised in this Motion have any direct relevance to Mrs. Coney's claim for consortium. We therefore, for the sake of convenience, refer throughout the opinion to a singular plaintiff, Mr. Coney.

when a section of grating that was supported by a defective, wasted angle iron, gave way under his weight as he was working as a stevedore on the vessel.  Coney asserted that defendant was negligent for its failure to properly inspect and maintain the grating and catwalk system in the areas where he was working.  Defendant NPR, Inc. ("NPR"), the owner of the vessel, challenged Coney's assertions of how the accident occurred, and claimed that the grate was not defective and that it did not, in any event, play a part in the accident sequence.  Defendant further challenged Coney's contention that his concededly diminished physical condition was as aggravated as plaintiff had represented or that it was causally connected to the accident.

The jury was presented with a simple verdict sheet which asked initially, "Do you find that defendant was negligent?" and if yes, "Do you find that this negligence caused harm to Michael Coney?"  (N.T. September 21, 2006 at 173-174).  The verdict sheet then dealt with the question of contributory negligence, apportionment, damages and Mrs. Coney's loss of consortium claim.  Significantly, as it pertains to issues raised by this motion, the jury answered "No" to the first question.  (N.T. September 21, 2006 at 81).  This response ended their deliberations and resulted in a verdict and the entry of judgment against both plaintiffs and in favor of NPR.  Accordingly, neither causation nor damages were ever determined by the jury.

## II.    PLAINTIFF'S ASSERTIONS

Plaintiff filed a timely motion for new trial on October 3, 2006 essentially reserving a recitation of particularized grounds to support his position until the record was completed.  Defendant filed a timely response.  Having been advised that the transcript was prepared, we entered an Order on February 5, 2007 directing that plaintiff file any supplemental motion on or before February 26, 2007 ("Pl. Supp. Mot.") and that he file a memorandum of law in support of his original and supplemental motions on or before April 23, 2007.  After plaintiff timely filed a

Memorandum of Law ("Pl. Memo") and defendant filed its opposition ("Def. Memo"), plaintiff filed a response ("Pl. Reply") to that opposition to which defendant then responded ("Def. Sur Reply").  Oral argument was held on May 24, 2007 and the matter is now ripe for resolution.

In his comprehensive supplemental motion, plaintiff set out twenty assignments of error.[2] In his more mature document, however – the memorandum of law – he specifically (and prudently) narrowed his focus to only four points.  They constitute challenges to (1) the court's charge on defendants' turnover duty; (2) the court's failure to charge on the active operations duty; (3) the court's refusal to discharge juror Mark Staudenmeier ("Staudenmeier"); and (4) the court's handling of the testimony of plaintiff's treating physician, John J. Park, M.D. ("Dr. Park").

While we focus principally upon these four assignments of error, plaintiff advised us at oral argument that he was not abandoning the other sixteen points.  While this was not particularly helpful, we feel compelled to touch upon all points raised, even though we observe that it is clear that plaintiff seriously asserts only those four issues which were supported by his Memorandum.[3]

---

[2] Only one assignment of error appearing in the original Motion for New Trial (Doc. 139) was not addressed in the later Supplemental Motion, which was that the court erred by not sending the exhibits out with the jury.  In that this assignment of error was never again raised nor briefed, and, given its non-specific and frivolous nature, we decline to consider it.

[3] We note additionally that we examine these other sixteen points despite instructive Third Circuit precedent which holds that, in the appellate context, claims not raised and argued in a moving party's brief are abandoned and waived.  *See, e.g.*, *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (holding that failure to raise issue in compliance with Federal Rule of Appellate Procedure 28(a)(3) and (5) and Third Circuit Local Appellate Rule 28.1(a), which require appellants "to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief," means that appellant has "abandoned and waived that issue on appeal and it need not be addressed by the court of appeals"); and *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 71 n. 5 (3d Cir. 1994) (holding that the

Broadly speaking, we divide the twenty points of error into three categories. The first two points relate to our decision to deny plaintiff's motion to remove juror Staudenmeier on the sixth day of trial. In addition to the principal point pertaining to the refusal to remove Staudenmeier, plaintiff also asserts that his counsel should have been permitted to question the juror directly as part of the inquiry on this topic. The second group of points of assigned errors concerns multiple evidentiary rulings made in connection with testimony taken of plaintiff's expert Captain Joseph Ahlstrom, plaintiff's witness Howard Davenport, defendant's expert Walter Curran, and plaintiff's treating physician Dr. John Park, together with our refusal to explain with particularity the plaintiff's version of the absence of his witness, Albert Sullivan. Finally, plaintiff has raised challenges to aspects of the court's charge where he asserts that we improperly failed to instruct the jury as per his requests with respect to *res ipsa loquitur,* circumstantial evidence, defendant's turnover duty, defendant's active operations duty, constructive knowledge, that only one breach need be proved, and substantial factor.

## III.   DISCUSSION

### A.   The Refusal to Remove Juror Mark Staudenmeier

Before discussing the specifics of this issue we set out the legal standards to be applied.

#### 1.   *Legal Standard*

The court of appeals will review a district court's decision regarding a motion to dismiss a juror for cause using an abuse of discretion standard. *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 153 (3d Cir. 1995) (citing *United States v. Polan*, 970 F.2d 1280, 1284 (3d Cir. 1992)),

---

raising of an issue for the first time in a reply brief is "one brief too late" because "appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief").

cert. denied, 507 U.S. 953, 113 S. Ct. 1367 (1993)).  Broadly speaking, in questions regarding juror impartiality, the factual determination of the trial court is entitled to special deference when reviewed on appeal.  *United States v. Salamone*, 800 F.2d 1216, 1226 (3d Cir. 1986). When presented with a request to remove a prospective juror for cause, the district court must determine "whether the juror holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id.* (citing *Wainwright v. Witt*,  469 U.S. 412, 424, (1985)).  The Supreme Court has long held that this determination is "essentially one of credibility, and therefore largely one of demeanor."  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  Generally, a court may determine that "[a] juror is impartial if he or she can lay aside any previously formed 'impression or opinion as to the merits of the case' and can 'render a verdict based on the evidence presented in court.'"  *Polan*, 970 F.2d at 1284 (citations omitted).  This does not mean, however, that the district court should not rely simply on a jurors' subjective assessments of their own impartiality.  *Kirk*, 61 F.3d at 156 ("[a] district court's refusal to excuse a juror will not automatically be upheld simply because the district court ultimately elicits from the prospective juror that he will be fair and impartial, despite earlier statements or circumstances to the contrary"); *see also Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir. 1987) (though a juror swears that he could set aside any opinion he might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if other facts of record indicate to the contrary), *aff'd*, 493 U.S. 342 (1990).

In that these credibility findings are not easily discernable from an appellate record, deference must be paid to the trial judge who sees and hears the juror.  *Witt*, 469 U.S. at 426. Therefore, "[w]here the appropriate inquiries have been made and the district court has made a

judgment on the basis of the jurors' responses, normally, that judgment will not be disturbed." *Salamone*, 800 F.2d at 1226.  Thus, it follows that "district courts have been awarded ample discretion in determining how best to conduct the voir dire."  *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d. Cir. 1993) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1991)).

Against these general principals, plaintiff has urged us to consider the issue under the two-part test set out by the United States Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).   There, the court reversed the Tenth Circuit Court of Appeals which had itself ordered a new trial based upon what it characterized as an honest, but mistaken, response to a question concerning whether the juror had experience with a serious product-related injury.   The Supreme Court set up, under this circumstance, a two-part test which requires that:

> . . . a party first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.

*McDonough*, 464 U.S. at 556.

Plaintiff is correct to point to *McDonough*, as the Third Circuit has been consistent in strictly applying the two-part test when deciding such issues.  *See, e.g.*, *Barnes v. Xtra Superfood Ctrs., Inc.*, 198 Fed. Appx. 188, 191 (3d. Cir. 2006) (affirming decision because the District Court followed two-part *McDonough* framework); *Williams v. Price*, 343 F.3d 223, 229 (3d. Cir. 2003) (explicitly following two-part *McDonough* framework as the applicable test when juror fails to disclose material information at voir dire); *United States v. Hodge*, 321 F.3d 429, 441 (3d. Cir. 2003) (explicitly following two-part *McDonough* framework as the

applicable test for motions for post-trial relief based on voir dire errors).

2.    *Discussion*

Given the nature of the injuries in this case, plaintiff had requested that the court inquire of the jury panel in voir dire whether anyone had suffered from any kind of back injury. The court complied and asked the entire panel two questions on this matter. First, "[Have] [a]ny of you, yourselves, close personal friends or family members, suffered from a back injury? And I don't mean just an occasional sore back in the morning, particularly when you get to be a certain age, but any significant back injury?" (N.T. September 13, 2006 at 24). Given that there were a few affirmative responses, the court then asked a follow up question, which was "[Do] any of you have any feelings by virtue of the nature of the injury, at least the significant injury that's alleged here, being a back injury – any of you have any feeling about the nature of that injury that would have any influence upon your ability to be fair and impartial in deciding this case?" *Id.* at 28. Staudenmeier did not provide an affirmative response to either question.

On September 20, 2006 (the sixth trial day), Staudenmeier brought to the attention of the court's deputy clerk that he had suffered from "some kind of back problem." (N.T. September 20, 2006 at 3). As he articulated to the court and counsel at sidebar, "[s]everal years ago, I was diagnosed with degenerative disc disease." *Id.* He explained that "it wasn't the result of an injury" and then stated that he did not bring the question of his back problem to the attention of the parties during the initial voir dire because "the question at the time was did I – did people have back problems as the result of an injury. And I didn't have anything, because this wasn't as the result of a specific injury." *Id.*

The court then commenced the following colloquy with Mr. Staudenmeier:

THE COURT: Now you obviously have heard that there's a lot of

7

testimony in this case concerning back injury, and cause of back injury, and you've already heard from Dr. Mascaro by videotape, Dr. Park by videotape.  And there will be a live medical witness this morning.

The question is, whether or not you think there's anything at all about the experience you've had with back – suffering any kind of back problem, that would effect [sic] your ability to be fair in this case?

JUROR: The only thing that I'm effected [sic] by is that, since this specific thing was mentioned, I certainly have a definitive opinion, at this point, whether or not somebody could recover from it.[4]

Having personally experienced that.

THE COURT: Okay.  All right.  Well we need to be careful about – I have to be careful about how I ask you this and you need to be careful about how you answer.  You will be given an instruction that, when you, as a member of the jury, go out to deliberate upon this case, your deliberation must be based upon the evidence that you've heard, consideration of what the witnesses have said, the videotape, live exhibits, plaintiff's testimony, etcetera, all the testimony that you've heard.  And nothing else.

And that you can't decide the case based upon anything other than that evidence.  Do you feel that the circumstance that you have had personally, that you've mentioned to us would prevent you

---

[4] At oral argument, counsel for plaintiff objected to the transcription of Staudenmeier's statements to the court.  He suggested that the transcript may have inaccurately reflected a statement about whether or not somebody could recover "from it," as opposed to "for it."  In making this objection, it is evident that counsel believed Staudenmeier may have given an opinion regarding one's ability to recover financially from another's negligence, as opposed to having opined about whether someone could recover physically from a medical condition.  In response to counsel's concern, we advised plaintiff that he might obtain an audiotape of this testimony and supplement his memorandum if he felt it necessary.  We have heard nothing further from plaintiff's counsel on the topic since that time.

Under 28 USCS § 753 (b) there is a presumption that a certified transcript is correct.  Specifically, "[t]he transcript in any case certified by the reporter or other individual designated to produce the record shall be deemed prima facie a correct statement of the testimony taken and proceedings had."  Plaintiff has failed to overcome this presumption and we therefore accept the record as prepared and certified by the reporting service.

from following that instruction?

JUROR: Not knowing the instruction, I would say not.  It's hard to –

THE COURT: Well the instruction is pretty much what I had said to you.  I mean, it will basically be and I did say it even in the pre-charge, which is that, the case must be decided by you as jurors.  You and all the other jurors.  Based upon the evidence that you hear in this courtroom.  And that you have to make factual determinations.  You'll be guided by the instruction that I give you on the law.

Certainly counsel's free to make the arguments that are appropriate for them to make.  But you, as a member of the jury with the other jurors, and in consideration with the other jurors have to say as part of a deliberative process will have to make a decision on the question of liability and the question of damages if liability's found.

And you must do it on that basis alone.  If you have any concern that you would not be able to do that, you know, you need to let us know.

JUROR: I'm okay with that.  I mean, based on the medical testimony I've heard so far and –

THE COURT: I don't want you to comment on it, but – okay, so you think you would be able to follow the instruction that would be given to you?

JUROR: Yeah.  I think so.

*Id.* at 3-5.

Following the colloquy, plaintiff moved to have Staudenmeier excused on the basis of

"inconsistent standing."  *Id.* at 7.  Plaintiff's counsel stated:

Juror number 1 [Staudenmeier], he expressed some inconsistent thoughts, I believe.  Number one, he said he didn't mention anything of this in voir dire, which is, again, inconsistent with it, so – but mentioning everything. [sic] And he said that the condition he has is not due to injury, and that's a very important issue in this case, whether it's due to injury or not.

9

> I do believe that this concerns him so much that he brought it to
> our attention. And based on his *inconsistent standing* when he
> was accepted as a juror and what he says now and why he's
> saying this, I think he should be removed.

*Id.* (emphasis added).

As plaintiff relies upon *McDonough*, his argument fails. Simply put, Staudenmeier did not fail to answer honestly a material question on voir dire, as is required to meet the first prong in *McDonough*. 464 U.S. at 556. In fact, he answered the questions put to him carefully and correctly. Because there was no failure to answer honestly, plaintiff does not even reach the second prong of the *McDonough* test.

Ultimately, what matters in a consideration of the question of whether a juror should be disqualified is whether he or she would be able to render a fair and impartial verdict based upon the facts as he or she finds them and as applied to the law as per the court's instructions. The colloquy with Staudenmeier reflects that he was able to undertake his responsibilities in this regard.

After discussion between the court and counsel outside the hearing of the juror, Staudenmeier was again questioned upon a request by Mr. Andrew Quinn ("Quinn"), counsel for defendant, as follows:

> THE COURT: . . . we have a record and I'm not going to go back
> to see what the record actually says, but there was a question
> generally, I'll ask you if you remember there was a question
> generally about whether any jurors have had any – potential
> jurors, when you were part of the panel, had suffered any
> problems with the back, did you raise your hand positively about
> that?
>
> JUROR: No, I didn't.
>
> THE COURT: What were you thinking of at the time?

10

JUROR: I heard the word injury, as the result of injury.  I didn't have a specific injury.

THE COURT: Okay.

JUROR: That's what I heard.  I was hesitant on that question, but when I heard injury, I didn't have an injury or work-related injury.  It's something that just came up.

THE COURT: Okay.  Would you appreciate that whatever may have happened to you and whatever has happened to you in the treatment and care that you have had with respect to your back, is something that would have nothing to do with Mr. Coney and whether he suffered a back injury as a result of this, what the treatment may have done, whether he has recovered or not, anything at all like that, you realize all that has to be based upon the evidence that you hear in this case and not based upon some personal experience that you have had?

Do you feel you could follow an instruction along those lines?

JUROR: I could follow that.

THE COURT: Do you have any hesitancy about it?

JUROR: I guess just what I told you, it's hard to take personal things, at the end of the day, you know, without getting specifics.  You know, there's a lot of information that comes out –

THE COURT: Sure.

JUROR: – and then there's judgment at the end of the day.  Because, obviously, some people say one thing, some people said another.

THE COURT: Sure.

JUROR: To stand there and say, I'm not going to draw on, you know, when making a judgment and deciding who's right, you know –

THE COURT: Sure.  Well but you understand that our system can work only if there is something called "the law", which is my responsibility to give.

11

> JUROR: Sure.  I have no problem apply [sic] the law and whatever the instructions are following those instructions based on the evidence.

Satisfied with the responses given by the juror, the court then stated:

> THE COURT: All right.  I'm satisfied that Mr. Staudenmeier appears to be diligent enough to bring to our attention this circumstance.  I'm satisfied that he has answered the questions that we've propounded to – that I've propounded to him in a serious, thoughtful way.
>
> And I appreciate counsel's motion, but it's going to be denied.

(N. T. September 20, 2006 at 8-10).

Plaintiff will have waived any other rationale offered to excuse juror Staudenmeier absent substantial injustice, as the right to claim error on appeal is not preserved by a correctly overruled objection at trial if the objection is based on a different ground than on appeal.  *See* 1 Jack B. Weinstein & Margaret A. Berger,  *Weinstein's Federal Evidence* § 103.12[3] (Joseph M. McLaughlin, ed.,  Matthew Bender 2 ed. 2007); *U.S. v. Mennuti*, 679 F.2d 1032, 1036 (2d Cir. 1982) (defendant barred from asserting on appeal that testimony should have been excluded under Fed. R. Evid. 608 because objection below was based solely on Fed. R. Evid. 403).

Our careful consideration of the record together with a consideration of the relevant authorities convinces us that the colloquy was properly handled and the plaintiff's motion to excuse juror Staudenmeier was properly denied.   First, the record is very clear that Staudenmeier considered the questions put to the jury panel carefully and was correct in not responding to the question about who might have suffered a back injury.  The specific questions asked during voir dire dealt with one suffering from  a "back injury."  (N.T. September 13, 2006 at 24, 28; *see supra*. at 7).  The juror correctly interpreted the question and properly did

12

not bring to the attention of the court or counsel his degenerative condition.  *Id.*  His lack of response to the question asked in general voir dire was correct and his position concerning the distinction between a *back injury* and a degenerative condition was careful and precise.  Simply put, there was no inconsistency.

Plaintiff's argument fails on the second aspect of the *McDonough* standard as well.  The colloquy the court conducted with Staudenmeier showed that he demonstrated appropriate and prudent caution, and that he could be fair and would follow the court's instructions as would be (and were) given in this case.[5]  Upon careful consideration of Staudenmeier's demeanor, it is the court's opinion that he was a particularly conscientious, careful and credible juror who undertook his obligations seriously.  I accepted his thoughtful responses and concluded that he could follow my instructions and be fair.

Moreover, we note that concern about Staudenmeier grew out of the juror's own back

---

[5] This portion of the charge of the jury's role was given in the preliminary instructions ("First, and most important, you are the judges of the facts.  You are the sole judges of the facts. You determine what the facts are in this case.  You will then have to apply to those facts the law which I give to you.  You must follow the law, whether you agree with it or not."  "Now, anything that you may have seen or you may see or have heard or may hear that takes place outside the courtroom must be totally disregarded by you."  (N. T. September 13, 2006 at 96, 99)), again in colloquy with Mr. Staudenmeier (as quoted in the main text above, (N. T. September 13, 2006 at 3-5, 8-10)), and then again in the final charge to the jury ("In reaching the verdict, you must determine the facts from all the testimony that you've heard and from the other evidence which has been received during this trial . . . [Y]ou are the sole and exclusive judges of the facts.  Neither I nor anyone else may infringe upon your responsibility in that regard.  You must, however, . . . accept the rules of law as I have given them to you, whether you agree with them or not and apply that law as I stated it to the fact[s] as you find them."  "It's not the recollection of counsel that control. [sic[ It's your recollection of the facts that govern the case. [sic]  You've been chosen and sworn as jurors to try the case or to consider the issues in the case and decide the issues of fact.  You are to perform this duty without bias or prejudice to any party. The law does not permit you to be governed by sympathy, by prejudice, or by public opinion. Both the parties and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by me and reach a just verdict regardless of the consequences of that verdict."  (N.T. September 22, 2006 at 72-73, 75)).

problems and any fixed views he might have had with respect to back-related ailments.  It is therefore significant in this regard to note that the jury never had to reach the question of any injury Coney may have suffered as a result of the occurrence in that they determined that the defendant was not negligent in the first instance.  (N.T. September 22, 2006 at 81).  Under these circumstances, we conclude that any belief or opinion the juror may have had would not have "prevent[ed] or substantially impair[ed] performance of his duties as a juror in accordance with his instructions and oath."  *Salamone*, 800 F.2d at 1226 (citing *Witt*, 469 U.S. at 424).  Any error in this regard would have been harmless.  *See* Fed. R. Civ. P. 61.

As a separate assignment of error, plaintiff has indicated that "it was error for the court to deny plaintiff's attorneys the opportunity to question juror Staudenmeier during the trial." (Pl. Supp. Mot. at 1, Doc. 151).  This argument fails for the simple reason that counsel for plaintiff never requested an opportunity to question the juror during the trial during the entire discussion.[6]

In addition, the law is very clear that the manner of the voir dire of any prospective juror is within the broad discretion of the court.  It is certainly within the court's discretion to conduct voir dire examination itself.  See Fed. R. Civ. P. 47(a); *James v. Continental Insurance Co.*, 424 F.2d 1064 (3d Cir. 1970);  *Kirk*, 61 F.3d at 153; *Salamone*, 800 F.2d at 1226.  Here, counsel

_____

[6] Although plaintiff has not briefed this point, we expect they would choose to point out that the court had indicated it would not permit him to question the juror directly.  Indeed, during the colloquy, the court stated, "I don't want any counsel to ask him any questions, but does counsel have anything else that you think I should cover with him?  Just say yes or no, and if you do we'll discuss it out of his hearing and I'll consider whether to ask him about it."  (N.T. September 20, 2006 at 5-6).  Counsel for plaintiff did not accept this offer.  We note that counsel for defendant did and requested that the court make a further inquiry as to whether the juror had spoken to the jurors about his back problems.  This request was granted.  *Id.* at 7.

was fully engaged in the process and given an opportunity to provide input along the way. There was no error – and even if there was, it was certainly harmless.  *See*, Fed. R. Civ. P. 61.

### B.    Evidentiary Rulings

Before dealing substantively with the issues raised by plaintiff concerning various evidentiary rulings, we consider the legal standard by which we determine whether any error that may have occurred in this area would require a new trial.  We then consider the objections we sustained in connection with the testimony of plaintiff's treating physician Dr. John J. Park. Finally, we briefly consider the remaining points which plaintiff has not briefed.

#### 1.    Legal Standard

In order to prevail on a motion for a new trial on the basis of trial error, the court must first determine whether an error was made in the course of trial and second determine "whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice."  *Brown v. Old Castle Precast E., Inc.*, No. 00-2549, 2003 U.S. Dist. LEXIS 1314, at *6 (E.D. Pa. Jan. 15, 2003); Fed. R. Evid. 103(a).  The legal standard here is that where a party contends that "a new trial is based on the admissibility of evidence, the trial court has great discretion . . . which will not be disturbed . . . absent a finding of abuse."  *Brown*, 2003 U.S. Dist. LEXIS 1314, at *6 (quoting *Threadgill v. Armstrong World Indus.*, 928 F.2d 1366, 1370 (3d Cir. 1991)).  An error or defect that "does not affect the substantial rights of the parties" is harmless, and thus must be disregarded.  Fed. R. Civ. P. 61; Fed. R. Evid. 103(a); *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 923-928 (3d Cir. 1985) (ruling that does not substantially affect parties' rights is harmless error); 12 *Moore's Federal Practice*, § 61.01 (Matthew Bender 3d ed.); 1 *Weinstein's Federal Evidence*, § 103.41.  In making the determination of whether an error was harmless, the court considers the centrality of the

evidence and the prejudicial effect of its inclusion or exclusion.  12 *Moore's Federal Practice*, § 61.02[2]; 1 *Weinstein's Federal Evidence*, § 103.41[1].  Such a determination is not a mere mechanical analysis, but depends upon the facts of each particular case.  *Id.*

The party seeking to prove the error in admission or exclusion has the burden of showing that the ruling has affected the result of the trial.  12 *Moore's Federal Practice*, § 61.02[3].  For example, improper admission of evidence is harmless where the effect of the evidence upon the jury was slight.  12 *Moore's Federal Practice*, § 61.06[1]; *Pregeant v. Pan American World Airways, Inc.*, 762 F.2d 1245, 1249 (5th Cir. 1985).  Regarding the allegation that competent evidence was improperly excluded, other circuits have found such an error to be harmless where the evidence was cumulative; found its way into the record anyway; or would not have affected the outcome based on the jury's finding.  12 *Moore's Federal Practice*, § 61.06[6].

### 2. *Testimony of Dr. Park*

Plaintiff asserts that the court erred by sustaining certain objections raised by the defendant during the testimony of Coney's treating physician, Dr. Park, when he was asked to opine on the veracity of Coney's complaints of pain.  (Pl. Supp. Mot. at 2; Pl. Memo at 19-29).  Coney argues that this evidence "was vital to rebut the attacks which the court *would* allow on plaintiff's honesty and credibility."  (Pl. Memo at 20) (emphasis added).  Plaintiff further argues that Dr. Park, as plaintiff's treating physician, should have been "allowed to give his opinion as to the reliability of plaintiff's complaints and his history during his direct testimony so that plaintiff could anticipate and effectively diffuse the defendant's forthcoming attacks."  *Id.*

Dr. Park specializes in anaesthesiology and pain management (Park Dep. at 8-9).[7]  He first saw Coney on December 11, 2002 (*Id.* at 29), almost 18 months after the incident on the S.S. Humacao.  There were many follow-up visits – at least one every two months as of the first half of 2006 (see references to multiple appointments, *Id.* at 113-118) – as the doctor continued to treat and direct efforts to help Coney manage his pain.  Dr. Park testified that he took a medical history from Mr. Coney at the time of his first visit.  He said that Coney:

> came to see me with primary complaints of low back pain and right leg pain.  He was – he told me that they started after a work-related injury on June 15 of 2001.  He was working.  And he was – his foot got caught in a grate and as a result he was – he fell in a twisted motion and he developed his pain afterwards.
>
> He treated with a number of other physicians include – and had – had treatment that included an injection in the spine.  And he saw Dr. Bong Lee who felt the patient may be suffering from disease called RSD and sent the patient to see me.

*Id.* 29-30.  Dr. Park went on to testify that he "actually thought [Coney] was suffering from radiculopathy, but I did not want to specifically say one way or another based on one examination."  *Id.* at 32.  Ultimately, Dr. Park testified that Coney suffered from "lumbar disc herniation and degenerative disc disease at multiple levels, but particularly the L4-5 disc that is causing his lumbar radiculopathy,"  *Id.* at 35.  He further testified that those injuries were caused by "his fall that occurred on – in 2001."  *Id.*

In forming his opinion, Dr. Park made it clear that he relied upon Mr. Coney's subjective complaints.  He testified that Mr. Coney described his pain "as a diffused aching and sharp pain in his low back, bilateral hips and the right calf area."  *Id.* at 33.

---

[7] Our references are to the Park videotaped deposition of August 28, 2006 which was presented in substantial part by the plaintiff in its case in chief on September 18 and 19, 2006. (Doc. 131, 132).

In response to a question from plaintiff's counsel about "any other tests or studies[8] that confirmed your diagnosis," he testified:

> Actually you don't make a diagnosis based on one test.  You – a — how I would like to and how most physicians would like to make their diagnosis and is the proper way to make the diagnosis is through a thorough history of talking to the patient, asking different questions, physical examination, looking for abnormalities in the physical examination and correlating that history and physical examinations with any diagnostic studies, so nobody really gives a – nobody should give a diagnosis based on just one diagnostic test over another."

*Id.* at 40.

More particularly, with respect to Dr. Park's consideration of Mr. Coney's subjective complaints, the record makes clear that the doctor relied upon and confirmed these complaints:

> Q.    [By plaintiff's counsel, Mr. Fine] Doctor, is or is not [sic] part of your examination and treatment and evaluation of patients dependent upon whether you find their complaints of pain valid?
>
> A.    All the time no, sometimes yes.
>
> Q.    With Mr. Coney?
>
> A.    With Mr. Coney.  Yes.
>
> Q.    Now, in connection with the pain that Mr. Coney has, is his pain intermittent or constant?
>
> A.    Sure.  He has both components.  He has a constant component as well as an intermittent component, but he certainly [h]as constant pain.
>
> Q.    Based on your diagnostic studies of Mr. Coney, would that indicate to you medically whether the pain would be constant?

---

[8] Coney had received an EMG from his treating neurologist, Dr. Mandell.  (*Id.* at 38-39).

18

A.      Actually, I would expect constant pain with an intermittent component as well, so it's exactly what I would expect him to present as.

Q.      Based on your testing?

A.      Based on not just diagnostic tests.  Based on my diagnosis.

*Id.* at 57-59.

The record makes it clear that Coney's subjective complaints played a critical part in Dr. Park's diagnosis.  The jury heard Dr. Park state unequivocally on at least two occasions that he believed that Coney's current back condition was the result of the accident on the S.S. Humacao.  *Id.* at 35 and 51.  *See supra*. p. 17.  The jury also heard Dr. Park testify that Coney would not have been able to perform "his work as a longshoreman with these injuries" (*Id.* at 72) and that his condition, since the injury, was such that:

He can barely walk right.  He can barely walk.  He uses a cane to walk.  He limps when he walks.  Given his back condition, he could barely lift anything.  I certainly do not trust him to – I certainly do not trust him to even maneuver himself out of harm's way in any type of environment where there is likely to be a lot of heavy work, construction work, longshoreman work, working in a warehouse, whatever.  No, I just don't think he's capable of doing it.

*Id.* at 76-77.  In response to a question about how long he would "have this disability and be unable to do heavy work," Dr. Park stated, "The reality is in the near foreseeable future, he is not going to get any better.  I will have to use the word indefinitely."  *Id.* at 77.

It is against this record that we consider Coney's argument that the court committed reversible error when we sustained objections to questions seeking Dr. Park's opinions on whether Mr. Coney's testimony concerning his severe pain was "honest" (*Id.* at 52), whether he found "Mr. Coney's complaints of pain reliable" (*Id.* at 52-53) and to express his opinion on the

19

"accuracy of Mr. Coney's complaints of pain" (*Id*. at 52).

Broadly speaking, the case law makes it clear that the question of the assessment of the credibility of witnesses is the province of the jury and is not generally to be the subject of opinion testimony from independent witnesses.  4 *Weinstein,* §702.06(1)(a).  This is even the case with respect to expert witnesses.  Expert testimony as to the credibility of another witness "encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702."  *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999).  *See also Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005); *United States v. Gonzalez-Maldonado*, 115 F.3d 916 (1st Cir. 1997).  In *Griggs v. BIC Corp.*, 844 F. Supp. 190, 201 (M.D. Pa. 1994), a Pennsylvania State Police fire marshal was barred from testifying that he believed a youthful arson suspect's explanation of how a fire started.  Finding that the trooper's expertise was in the origin of fires and not in interviewing children and assessing their credibility, the district court found the testimony was properly excluded.  *Id.*

We accept that, under Fed. R. Evid. 703, a physician's consideration of his patient's subjective complaints of pain is important as it may play a part in forming the basis of his opinion.  A doctor may reasonably rely on a patient's description of symptoms in making a diagnosis.  Dr. Park understandably testified that his diagnoses involved "talking to the patients, asking different questions . . . ."  (Park Dep. at 40).  He also testified that part of his "examination and treatment and evaluation" of Coney was dependent upon finding Coney's complaints valid.  This testimony was presented without objection.  *Id.* at 57-58.

This does not mean, however, that Dr. Park should have been able to testify more broadly as to his opinion concerning the truthfulness and reliability of Coney's complaints.  The

20

Ninth Circuit, in *United States v. Barnard*, 490 F.2d 903, 913 (9th Cir. 1973) held that the trial court was not required to admit the opinion of the psychiatrist or psychologist regarding the veracity of a witness. *Id*. at 913. The court noted that to do so "may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral but still important matter." *Id*. at 912. The decision as to whether to admit such testimony was deemed to fall within the broad discretion of the trial judge (*Id.* at 913) to the extent that it arguably could have the effect of displacing the jury's responsibility to assess credibility and function as a "lie detector in the courtroom." *Id*. at 912.

The Eighth Circuit agreed with *Barnard* and in *United States v. Azure*, 801 F.2d 336, 339-41 (8th Cir. 1986), and even went a step further in ruling that a trial court abused its discretion by admitting such testimony. In that case, the issue was whether a pediatrician could testify as to his opinion of the truth of the story of his child patient who was allegedly a victim of sexual abuse. *Id*. at 339. Though the court agreed that in "special circumstances some expert testimony may be helpful," the court held that "putting an impressively qualified expert's stamp of truthfulness on a witness' story" was improper. *Id*. at 340. While such an expert may properly summarize the medical evidence and express his opinion as to whether it was consistent with patient's story, he may not put his "stamp of believability" on the patient's story, as he is "not qualified to judge [its] truthfulness." *Id*. at 340-41. Citing *Barnard*, the court worried that admitting the testimony may have caused the jury to "have relied on his opinion and 'surrender[ed] their own common sense in weighing testimony. . . .'" *Id*. at 341.

Following its own precedent, the Eighth Circuit in *United States v. Whitted*, 994 F.2d 444, 447 (8th Cir. 1993) ruled that the testimony of a doctor, whose diagnosis that his patient was repeatedly sexually abused was actually based on a subjective belief of the patient's version

21

of events rather than objective medical findings, was inadmissible expert testimony under Fed. R. Evid. 702.   Like the doctor in *Azure*, the doctor here "was not qualified to judge truthfulness." *Id.*  Once again, the court determined "[t]here was a substantial risk that the jury surrendered its own common sense in weighing [the doctor's] testimony and deferred to [his] diagnosis without knowing the diagnosis was nothing more than a subjective opinion favoring [the patient]." *Id.*  The court therefore held admission of this testimony to be a clear mistake requiring reversal of the defendant's criminal conviction. *Id.* at 447-48.

Nonetheless, plaintiff views the proffered testimony as "vital to rebut the attacks which the court would allow on plaintiff's honesty and credibility" (Pl. Memo at 20) and that defendant's medical expert "was going to extensively comment upon and give his negative opinions as to the veracity of Michael Coney's physical complaints," (*Id.* at 20) necessitating, in the eyes of plaintiff's counsel, the need for Dr. Park to opine on Coney's truthfulness at that stage.

As plaintiff's argument suggests, the timing of Dr. Park's testimony presented a problem, from his perspective, in that he now says that certain questions to which objections were sustained anticipated testimony which had not yet been offered into evidence – namely that of Dr. Ronald Greene, the defendant's medical expert.  In that plaintiff relies upon Fed. R. Evid. 608 to support his position on the admissibility of this opinion evidence (*Id.* at 22-23), he must accept that the plain language of the rule makes it clear that this evidence may be "admissible only *after* the character of the witness for truthfulness has been attacked. . . ." (Fed. R. Evid. 608(a)(2)) (emphasis added).

In *United States v. Bolick*, 917 F.2d 135, 139-140 (4th Cir. 1990), the Fourth Circuit held that admission of rehabilitative testimony regarding a witness's credibility before any

attack had been made on that witness's credibility was improper and constituted error on the trial court's part. The court explained that it followed the "time-honored principle" that ". . . a witness's credibility may not be rehabilitated unless it first has been challenged." *Id.* at 138 (quoting *United States v. Henderson*, 717 F.2d 135, 137 (4th Cir. 1990)).

The Eleventh Circuit ruled the same way in *United States v. Hilton*, 772 F.2d 783 (11th Cir. 1985), a case cited by the Fourth Circuit in *Bolick*. In this case, the court held that the admission of "bolstering testimony" before a witness's character for truthfulness had been attacked constituted reversible error. *Id.* at 786. The court explained that the purpose of the rule is "primarily to avoid a needless consumption of time," since absent an attack by the opposing party, "[e]very witness may be assumed to be of normal moral character for veracity, just as he is assumed to be of normal sanity." *Id.*

The Fifth Circuit also ruled the same way in *United States v. Price*, 722 F.2d 88, 90 (5th Cir. 1983), which the Eleventh Circuit cited in *Hilton*. The Court ruled that admission of "bolstering testimony" introduced by the government in favor of one of if its witnesses before that witness's credibility had been attacked required the reversal of the defendant's conviction. *Id.* at 90-91. The court held that "[n]o principle in the law of evidence is better settled than . . . the rule . . . that testimony in chief of any kind, tending merely to support the credit of the witness, is not to be heard except in reply to some matter previously given in evidence by the opposite party to impeach it." *Id.* at 90 (quoting *United States v. Holmes*, 1 Cliff. 98, 26 F.Cas. 349, 352 (C.C.D.Me.1858) (No. 13,382)).

Even if one were to accept that the testimony of Dr. Greene concerning the relationship between physical findings and plaintiff's subjective characterizations of his pain was proper under Fed. R. Evid. 608, the evidence was not offered "*after* the character of the witness for

truthfulness ha[d] been attacked." (emphasis added). Plaintiff made no request at trial to offer this evidence upon the completion of Dr. Greene's testimony when it might properly have been considered. It is simply too late for him to make that argument now. Counsel's suggestion that it would have been "awkward, unworkable and not as effective to put in after the isolated redaction portions of his deposition as rebuttal" (Pl. Memo. at 22) speaks of a tactical decision made by the plaintiff for which only he is accountable.

Plaintiff also seems to suggest that the evidence should have been accepted at the time it was offered to the extent that Mr. Coney had been impeached "with his alleged prior statements, with his treatment statements and with prior medical reports to show that plaintiff concocted his story, as well as the extent of and reason for his injury, and his symptoms." (*Id.* at 21). The question arises as to whether this kind of impeachment rises to the level that would permit rehabilitative evidence under Fed. R. Evid. 608. The Third Circuit has held that it does not. In *Renda v. King*, 347 F.3d 550 (3d Cir. 2003), the court stated as a general matter that "[d]irect attacks on a witness's veracity in the particular case do not open the door for evidence of the witness's good character." *Id.* at 554. The court cited the decision in *United States v. Dring*, 930 F.2d 687, 690 (9th Cir. 1991), where the Ninth Circuit explained that "[t]he purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness."

More specifically, the Third Circuit ruled, therefore, that "evidence of bias or prior inconsistent statements generally does not open the door for evidence of good character for truthfulness." *Renda*, 347 F.3d at 554. The court reasoned that "there can be a number of reasons for the [prior inconsistent statements], such as defects in knowledge or memory, a bias or interest to lie in this particular instance, or a general character trait for untruthfulness. Thus,

although the inconsistency may be due to a dishonest character, it is not necessarily, or even probably, due to this cause.  Thus, the relatively minor value of permitting a response to such an inference does not justify the cost of litigating the tangential issue of character for truthfulness." *Id.* (citing 3 Mueller and Kirkpatrick § 270; 4 Wigmore § 1108).

Even if the circumstances of this case gave rise to the admissibility of evidence under Fed. R. Evid. 608, the questions to Dr. Park were not asked in a manner that would have been permissible in any event.  Dr. Park was never asked about his knowledge of other persons who knew Coney and what, if any, reputation for truthfulness or honesty Coney had among those individuals.  The foundation necessary to establish such a reputation was not established.  We note that the testimony offered in the case of *Beard v. Mitchell*, 604 F.2d 485, 503 (7th Cir. 1979), cited by plaintiff as support for his position that 608 evidence is admissible, was offered with a proper foundation, including the witness's knowledge of the defendant's reputation for truthfulness in the community.  No such proffer was made in connection with Dr. Park and there is no indication anywhere in the record that the doctor had any knowledge or familiarity with Coney outside the context of the doctor-patient relationship.

The record supports the overall force of Dr. Park's testimony, which was that he clearly believed Coney's complaints of pain to be credible.  As this evidence was in the record and was available for consideration by the jury, any error that would have resulted from the exclusion of similar testimony was harmless.  *Moore's Federal Practice* § 61.06[6] (noting that errors will be harmless when the evidence excluded was cumulative or made its way into the record anyway).  Specifically, Fed. R. Civ. P. 61 states, "No error in either the admission of or the exclusion of evidence and no error or defect in any ruling or order . . . by the court . . . is ground for granting [relief] unless refusal to take such action appears to the court inconsistent with

substantial justice" or would "affect the substantial rights of the parties." The Third Circuit has further held that it is unnecessary for the non-moving party to "disprove every reasonable possibility of prejudice." *Id*.

Finally, we note that the only relevance of the excluded evidence here would have been to bolster plaintiff's credibility regarding the extent of his injuries and damages. The evidence would have had no bearing on the question of defendant's negligence. Yet here, the jury found that the defendant was not negligent in the first instance. (N.T. September 22, 2006 at 81). It therefore never even reached the question of any injury plaintiff may have suffered as a result of the occurrence. Under these circumstances we conclude that even if we erred in barring the evidence in question, such error would be harmless. Plaintiff is not entitled to relief.

### 3. *Testimony of Captain Joseph Ahlstrom*

Captain Joseph Ahlstrom ("Ahlstrom") testified as an expert witness on shipping operations for plaintiff. Generally speaking he opined that the S.S. Humacao was poorly maintained. Plaintiff sets out two assignments of error (Pl. Supp. Mot. points 3 and 4) with respect to his testimony. The first (point 3) arose in connection with Ahlstrom's testimony as to his opinion of the accident sequence. On direct examination he testified as follows:

> I believe Mr. Coney . . . was placed between two hatches in an unsafe condition. He put his foot down. He – the foot went through the grating. It came up. He got his foot caught, he twisted it, and he was injured... I believe that the grating, the angle iron beneath the grating gave way or – deterioration... that on proper inspection of those areas, that the – that that should have been caught, and . . . that area should have been roped off or the angle iron replaced or wood put down or whatever it was to. . . prevent the injury from occurring.

(N. T. September 14, 2006 at 27-28).

In cross-examination, Mr. Quinn, counsel for defendant, established that this opinion

was based solely on the testimony of plaintiff's witnesses and, in particular, Coney's account of the accident. *Id.* at 40-42. In a standard and appropriate manner of cross-examination, Mr. Quinn then presented Ahlstrom with alternative hypotheticals necessarily causing Ahlstrom to concede, without objection, that he "would change [his] opinion if [Coney's] foot had not gone through the grating. Yes. Certainly." *Id.* at 57. Without objection, Ahlstrom responded affirmatively to a cross-examination question from Mr. Quinn asking for the witness to agree "that injuries on ships can take place in a lot of different ways, correct?" (*Id.*) Again without objection, Mr. Quinn presented Ahlstrom with a fact-based hypothetical: "You're taking a lashing rod out of a tier three container, 16 feet long, 35 pounds. You have it in your hands. You're facing forward. You step off the lid three feet onto the grating. A lot of things could happen, do you agree?" and Ahlstrom responded, "I agree." *Id.* at 58. It was only after this series of questions that Mr. Smith objected and now assigns error for our refusal to sustain an objection to a further cross-examination question of a similar vein. "Mr. Coney could have hurt his back if he slipped on the grating, correct?" where the witness ultimately gives an affirmative response. *Id.* at 68-69.

Ultimately, it is for the jury to decide how the accident occurred and while we concluded that it was permissible for them to consider evidence presented by Captain Ahlstrom as plaintiff's expert on direct examination, it was also appropriate for them to consider other plausible factual scenarios suggested by the defendant on cross-examination. The cross-examination merely suggested alternative scenarios. It was proper.[9]

In plaintiff's second assignment of error (point 4) with respect to Ahlstrom, he contends

---

[9] Even if considered error, this ruling could not in any way be considered a basis for a new trial. *See* discussion of harmless error in Section B.1 *supra*.

that the court erred in sustaining an objection by Mr. Quinn to the question: "If the vessel was in [the shipyard for repairs] for two months in 2000, would you have expected as much rust to be on the areas that you saw in those photographs only a year later if it had been properly maintained?" *Id.* at 79.

We sustained Mr. Quinn's objection in Ahlstrom is not a metallurgist or rust expert and plaintiff made no effort to qualify him as such. Moreover, counsel for plaintiff was allowed to make his point in a more general way, when Ahlstrom testified that "the maintenance [on the ship] was inadequate." *Id.* at 74. The handling of this testimony was proper.[10]

### 4.    *Captain Davenport's Testimony*

Point 5 of plaintiff's Supplemental Motion he alleges that the court erred in overruling Mr. Smith's objection to Mr. Quinn's question to Howard Davenport ("Davenport"), the Captain of the S.S. Humacao, "What were Mr. Rayner's [the Chief Mate] procedures with regard to inspections if particularly crosswalks and gratings?" (N.T. September 20, 2006 at 30). Mr. Smith stated at the time of his objection that "[Davenport] obviously wasn't on the ship when Chief Mate Rayner was." *Id.*

While this simple fact was presumably correct, the evidence from Captain Davenport established however that he had been a Chief Mate on NPR-operated container ships from 1994 through 2002 (N.T. September 19, 2006 at 177) and that he had been a merchant marine since his graduation from the Merchant Marine Academy in June 1977. *Id.* at 171. He testified extensively as to the responsibilities of Chief Mate on NPR vessels, including a period from 1999 through April 2002 when he was Chief Mate on the S.S. Humacao itself. *Id.* at 177-186.

---

[10] Even if considered error, this ruling could not in any way be considered a basis for a new trial. *See* discussion of harmless error in Section B.1 *supra*.

He also testified about his relationship with Rex Rayner who was also the Chief Mate on the S.S. Humacao, serving in that capacity on alternating six-week intervals with Davenport. *Id.* at 181.  He testified as to a "changeover process" when they would discuss, among other things, "projects that are underway, repairs that were underway, the status of any repairs that might be there,"  (*Id.*) and that this process had occurred for about three years from 1999 through 2002.  *Id.* at 183.  Davenport was then asked, without objection, of his "impression" of Rayner's job performance and he responded, "He's an excellent, he was an excellent Chief Mate."  *Id.*  In this context, it was proper to overrule Mr. Smith's objection to Mr. Quinn's question, "What were Mr. Rayner's procedures with regard to inspections of particularly crosswalks and gratings?"  (N.T. September 20, 2006 at 30).  A sufficient foundation for him to answer the question had been established.  There was no error.[11]

     *5.*    *Mr. Curran's Testimony*

Mr. Walter Curran ("Curran") appeared as an expert witness on stevedoring and marine terminal operations for defendant, NPR.  At the time of the June 2001 incident, he was Director of Stevedoring Operations for Holt Cargo Systems ("Holt"), plaintiff's employer.  (N. T. September 21, 2006 at 46).  Plaintiff claims that the court erred in three aspects of Curran's testimony.  (Pl. Supp. Mot. at Points 6, 7, and 8).

Plaintiff first alleges error in overruling Mr. Smith's objection to the question referring to Holt's accident report, "Do you know the practice in completing this report?"  (*Id.* at Point 6).  At trial Smith argued, "He's going far beyond the report that Curran prepared in this case. I don't know whether he's being used as a fact witness or an expert."  (N.T. Sept. 21, 2006 at 69).

---

[11] Even if considered error, this ruling could not in any way be considered a basis for a new trial.  *See* discussion of harmless error in Section B.1 *supra*.

The report referred to was an accident report used by Holt.  Before the objection was articulated by Mr. Smith on behalf of Coney, the report itself had been marked as an exhibit (P9), was entered into evidence without objection and, in fact, had been published to the jury just prior to the question to which Mr. Smith objected.  *Id*. At 66-67.  Mr. Curran testified that he was familiar with the form, that it was used essentially as "a personal injury report," and that it was normally filled out by "the vessel superintendent, the person in charge."  *Id.* at 68.  The question was certainly appropriate and reasonable, and it followed upon the line of questioning to which there had been no objection.  Further, it is hard to see how the court's overruling Mr. Smith's objection with respect to the manner in which the report was prepared could, in any way, be deemed prejudicial error when Smith himself had agreed to the admission of the report and its publication to the jury.

The second and third alleged errors refer to the same passage.  (Pl. Supp. Mot. at Points 7, 8).  Mr. Smith moved to strike the testimony of Mr. Curran, where he made reference to "one of the possible ways" in which Coney may have been injured (N.T. September 21, 2006 at 114).  Plaintiff argues in Point 7 of his supplemental motion that it was error for the court to overrule his objection.  The record, however, does not reflect that any objection to the question was made.  *Id*. At 78-79.  The third alleged error, argued in Point 8 of plaintiff's supplemental motion, refers to the court's decision to deny the request to strike Mr. Curran's testimony reflecting that it was a possibility that Coney may have strained his back "simply trying to reach backwards and step down up a height holding rod." [sic] (*Id.* at 114). Plaintiff's claim has no validity.

The "possibility" to which Curran refers is "one of the possible ways [Coney] may have been hurt" (i.e. by tripping on lashing rods or simply twisting his back as he stepped down

while holding the rod).  *Id.*  Curran testified that if Coney's account were "absolutely true," then "obviously my statement [that it] is impossible, would be wrong."  *Id.* at 113.  This was proper cross-examination and was there for the jury to consider or not as it saw fit.  Later, Curran explained that these hypotheticals were only mentioned as a way of "giving Coney the benefit of the doubt that he actually hurt himself at the time in some manner . . . ."  *Id.* at 114. Moreover, plaintiff's counsel had the opportunity to object to Curran's initial statement – that he believed it was impossible that Coney injured himself the way he said he did – when Curran first articulated his reasons for this claim in Quinn's direct examination of him.  *Id.* at 78-80. Yet Smith raised no objection.  The handling of the examination was proper and without error.[12]

6.    *Statement to Jury About Albert Sullivan's Absence*

Albert Sullivan ("Sullivan"), plaintiff's brother-in-law, was working with Coney as a stevedore on the day of the accident, as he had done on a regular basis, for many years. Plaintiff's counsel had planned to call him as a witness and he was identified as such to the jury in counsel's opening.  Before the completion of plaintiff's case, however, the court was advised that Sullivan had become ill and was unavailable to testify as a live witness.  Although the defendant questioned the extent of his illness, we accepted the representations of plaintiff's counsel and advised the parties that the relevant portions of his deposition testimony could be read into evidence as part of plaintiff's case.

While the parties agreed to this process, plaintiff's counsel requested that the court advise the jury that Mr. Sullivan was unavailable due to an illness.  (N.T. September 15, 2006 at 3).  The court refused the request and advised counsel as follows:

---

[12] Even if considered error, this ruling could not in any way be considered a basis for a new trial.  *See* discussion of harmless error in Section B.1 *supra*.

THE COURT: I don't think that Mr. Sullivan's illness really should come into it.  I think I simply want to say that the circumstances are such that it's appropriate for certain testimony to come in through deposition and that the plaintiffs are now going to proceed with deposition testimony and then just tell them that they consider it like any other testimony.  I don't think they need to know anything about Mr. Sullivan's illness.

You know, Faust [Faustino Mattioni, co-counsel for defendant] wants to put something on the record, and that's fine.  I don't care what he wants to put on the record, but in terms of the jury, I don't think they need to be told about Mr. – Mr. Sullivan's illness.

MR. SMITH: Well, if the court please, he's local.  He's from South Philadelphia.  He's been referred to several times, and I indicated that – that I would give them testimony from Mr. Sullivan.  I didn't say, you know, in what form, but I think that in light of the fact that he lives so close, he's still alive insofar as they know, that they should have some explanation for why he isn't here in person, and all I'm asking is you say he's ill and he can't be here because of that.

THE COURT: It's a reasonable argument. Mr. Quinn?

MR. QUINN: Well, you know, this latest sheet that we got yesterday, Judge, didn't show any restrictions for Mr. Sullivan to do anything.  You know, he's doing a lot of things... driving, walking.

MR. MATTIONI: – if I may.  Just look at the highlighted area.  There is a serious question.  We accommodate Your Honor and counsel.  We shouldn't be penalized.

MR. SMITH: I'm not trying to penalize anybody.

THE COURT: I don't know how you're penalized...

*Id.* at 3-4.

It is very clear that the court has broad discretion in determining what, if any, explanation should be given to the jury about the absence of a witness.  The disputed medical condition of Mr. Sullivan at the time of trial had no bearing upon any issue in the case.

Evidence of it was properly excluded from the jury.[13]

C.      **The Court's Charge to the Jury**

The plaintiff assigned eight points of error in the court's charge to the jury.  The two principle points (and the only ones briefed) are that we 1) failed to properly charge the jury regarding defendant's turnover duty and 2) failed to charge at all on the active operations duty.

We briefly discuss five other alleged errors raised in Plaintiff's Supplemental Motion (Pl. Supp. Mot. at Points 13-14 and 18-20), which we number 3-7 here, where plaintiff asserts that the court: 3) failed to give a *res ipsa loquitur* charge; 4) failed to properly charge on circumstantial evidence; 5) failed to charge in accordance with plaintiff's requested jury charge 17 on constructive knowledge; 6) failed to charge in accordance with plaintiff's requested jury charge 18 on whether the shipowner need only be found negligent on one of two duties; and 7) failed to charge the jury in accordance with plaintiff's requested jury charge 19 that negligence must be shown to be a "substantial factor" in causing Coney's injury.  The eighth assignment of error, which states: "The court erred in giving the jury two additional points for charge prior to advising the plaintiffs of this fact" (Pl. Supp. Mot. At Point 15) has been withdrawn (*see* letter to Shanna McCann, Law Clerk to Magistrate Judge David R. Strawbridge from Louis Fine, Esquire and dated May 17, 2007, docket as Doc. No. 158).  After reviewing the applicable legal standard, we discuss the points raised in turn.

1.      *Legal Standard*

Where a party properly objects to a jury instruction, the Court of Appeals will exercise plenary review in determining "whether the jury instructions stated the proper legal standard."

_____

[13] Even if considered error, this ruling could not in any way be considered a basis for a new trial.  *See* discussion of harmless error in Section B.1 *supra*.

*United States v. Khorozian*, 333 F.3d 498, 507-508 (3d Cir. 2003) (citing *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995)).   The court will review the refusal to give a particular instruction or the wording of instructions for abuse of discretion.   *Id*.   Further, "when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *Id.*; *see also* 12 *Moore's Federal Practice* § 61.08.

If the court finds that the charge errors did not affect the outcome of the trial, or if the parties waived the errors by failing to timely object, challenges to jury instructions will be rejected as harmless.   12 *Moore's Federal Practice* § 61.02[2]; *see Foley v. Commonwealth Elec. Co.*, 312 F.3d 517, 520 (1st Cir. 2002) (if a party properly objects to a jury instruction, harmless error Rule 61 applies; if proper objection is not made, plain error rule applies which requires a higher standard of proof).   Further, parties must object to jury instructions as given. "Merely tendering proposed instructions to a court is insufficient to comply with the strictures of Fed. R. Civ. P. 51 which require that a party objecting to the giving or failure to give a particular instruction must state 'distinctly the matter objected to and the grounds of the objection.'" *Beaudry v. Corrections Corp. of America*, 331 F.3d 1164, 1168 (10th Cir. 2003) (citations omitted).

Failure to give a proposed instruction is not reversible error unless the instruction that is given is misleading or inadequately explains the law.   12 *Moore's Federal Practice* § 61.08. Erroneous instructions will also be harmless error if, based on the jury's verdict, they were irrelevant.   *Id.*   For example, "an error in the definition of damages is harmless if the jury finds no liability." *Id.*   Finally, "[t]he appropriateness and usefulness of instructions given to the jury are factors that may be crucial in determining whether an error is harmless."   1 *Weinstein's Federal Evidence* § 103.41[5][e].

2.      *The Court's Charge on the Turnover Duty*

Plaintiff has asserted that the court's charge on defendant's turnover duty was "inconsistent, confusing, misleading and prejudicial to Plaintiffs" in that it suggested that NPR had no further responsibility with respect to "dangerous conditions in common areas of the ship not turned over to the stevedore." (Pl. Supp. Memo at 1). Plaintiff begins his discussion by stating that "[t]he Court's charge on the turnover duty was in its most significant part inapplicable to the facts of this case" and was therefore misleading. *Id.*

In relevant part, the jury was charged as follows:

> Now in this maritime case . . . there is a particular duty which I instruct you applies to the case. That is what I referred to as the turnover duty . . . I instruct you that the law in this area imposes upon the shipowner the duty to exercise ordinary care under the circumstances, to have the ship and its equipment in such condition that an expert, an experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property and to warn the stevedore, the longshoreman, of any hazards on the ship or with respect to its equipment that are known to the vessel, the vessel owner, the vessel operators, or should be known to them in the exercise of reasonable care that would likely be encountered by the stevedore in the course of the cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.
>
> The shipowner thus has this duty with respect to the ship's gear, equipment, tools, work space, to be used in the stevedoring operations. And if he, that is the shipowner, fails to at least warn the stevedore of any hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to the longshoreman.
>
> However, under this duty, the vessel or NPR, need not supervise or inspect the stevedoring operation to discover and correct dangerous conditions which develop within the cargo areas as a result of those operations. So the shipowner could ordinarily

reasonably rely upon the stevedore and his longshore employee to notice obvious hazards, to take steps consistent with its expertise, to avoid those hazards where practical to do so.  A shipowner may be liable for failing to eliminate an eliminable hazard only if it should have expected that its expert stevedore would not avoid the hazard or conduct cargo operations safely.

Thus, if the conditions existing when the longshore workers began to work on board the ship, at the turnover time, is a condition that an expert, an experienced stevedore would not by the exercise of reasonable care be able to carry on its cargo operations safely to persons and property, you may find that the defendant has breached its duty of care to plaintiff by failing to warn the stevedoring company of the danger if you find the plaintiff has proven by a preponderance of the evidence the following factors.

First, the defendant knew or by the exercise of reasonable care should have discovered the danger on board the ship that led to the plaintiff's injury.  Second, that the dangerous condition was one that was likely to be encountered by the stevedoring company in the course of . . . his operation in connection with the defendant's vessel.  Third, that the danger was one that the stevedoring company did not know about and would not be obvious or anticipated by a reasonably competent stevedore.

(N.T. September 21, 2006 at 167-69).

We then instructed the jury that:

Under this duty, the vessel need not supervise or inspect the stevedoring operation to discover and correct dangerous conditions which develop within the cargo areas as a result of those operations.  So, a shipowner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so.  A shipowner may be liable for failing to eliminate an eliminable hazard only if it should have expected that its expert stevedore would not avoid the hazard or conduct cargo operations safely.

(N.T. September 21, 2006 at 169).

Plaintiff focuses primarily on the third paragraph quoted above (beginning "However,

36

under this duty . . ."), which they put in boldface in their brief.  He argues that this language "contradicted the preceding and succeeding paragraphs and created the incorrect impression that the vessel was relieved of its continuing responsibility for common areas of the ship not turned over exclusively to the stevedore simply because cargo operations had begun."  (Pl. Supp. Memo. at 3).  Plaintiff has raised issues with two specific phrases in that paragraph.

Plaintiff argues that the term "cargo areas" is misleading because Coney's injury occurred not in a cargo area but a "common area," a difference that they claim has important legal consequences.  *Id.* at 1.  Common areas are those that both longshoremen and the vessel's crew use and are thus not "turned over" to the stevedoring company.  They then remain, according to plaintiff, the responsibility of the ship, especially with respect to maintenance and safety.  Plaintiff argues that, even though Coney was doing stevedoring work, the catwalk where the injury allegedly occurred must be considered a "common area" because testimony clearly showed that the vessel crew used the catwalks as well, and that in fact the ships's electricians had used the catwalk on the morning of the incident.  *Id.* at 4-6.  By using the phrase "within cargo areas," plaintiff claims that the court, in effect,  instructed the jury, "that it is the longshoremen's, not the shipowner's, duty to discover and correct or avoid an obvious hazard, i.e. because stevedoring operations were underway, the vessel was relieved of its responsibility to discover dangerous conditions which existed in those areas being used by the stevedore."  *Id.* at 3-4.

In support of this assertion, plaintiff refers to *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 104 (1994), where "the Supreme Court held that the cargo stow is separate and distinct from other aspects of the ship."  *Id.* At 4.  As applied to this case, however, the reference is somewhat misleading in that the focus in *Howlett* was on the cargo stow, which

was not a commonly used area.  To then state, as plaintiff does, that "[a] commonly used deck is never the stevedore's responsibility" (*Id.* at 5) may well be the case with respect to a latent defect, but is not the case with respect to a hazard created by the stevedores during their operations.  *Id.* at 5).[14]

Plaintiff also takes issue with the court's reference to "obvious hazards."  *Id.* at 6.  He claims that by using the phrase "obvious hazards" in the charge, the court gave "difficult and confusing" (*Id.* at 8) instructions because the defect that plaintiff alleges caused his injury was "a hidden, non-obvious defect in the deck" (*Id.* at 6), and that therefore the phrase "obvious hazards" does not apply, and even had the "effect . . . [of] exonerat[ing] the Defendant."  *Id.* at 8.  Given its alleged inapplicability here, plaintiff speculates that "[t]he jury was thus left to wonder why the term was employed, if for no other reason than to imply that the plaintiff should have effortlessly and readily perceived the defect in the ship which caused his injury." *Id.* at 9-10.  Plaintiff then cites *Kirsh v. Plovidba*, 971 F.2d 1026, (1992), *Scindia Steam Navigation Co. Ltd. v. De Los Santos*, 451 U.S. 156 (1981) and *Howlett* again to show that the shipowner is liable for non-obvious hazards.  (Pl. Memo at 10).

The problem with plaintiff's position is that it assumes that Coney's injury was in fact caused by a defective grating and/or angle iron, as he claims.  This was not, however, an undisputed fact.  Indeed, throughout the trial the defendant challenged plaintiff's version of the accident sequence, raising questions about plaintiff's own conduct in handling the lashing rods and pointing out that plaintiff made no reference to the allegedly defective grate in his accident

---

[14] In *Howlett*, the "cargo stow" was within a hold of the vessel where cocoa beans were stored.  Plaintiff was injured when he jumped from surrounding bags of beans some three feet onto the deck of the hold and slipped on a plastic sheet which had been placed there by foreign stevedores.  *See Howlett*, 512 U.S. at 94.

report or on early medical visits.  (*See, e.g.*, N.T. September 15, 2006 at 5, 6, 8, 9).  One of defendant's experts (Curran) even stated unequivocally that it would be impossible for Coney to have hurt himself the way he says he did.  (N.T. Sept. 21, 2006 at 78).  We therefore believe that it was appropriate to refer to "obvious hazards" insofar as it refers to at least one of the possible ways in which Coney may have hurt himself – say, by tripping on a stray lashing rod or by stepping down from a hatch cover while awkwardly holding a 16 foot long, 35 pound rod. We do not accept that the charge caused confusion.  We believe that it was balanced and provided the proper legal framework for the jury to resolve the case.

We note that the charge dealt with not just "obvious hazards," but also of "hidden danger."  *Id.* at 167.  This came in the form of the standard accepted turnover duty charge emanating from Justice White's opinion for the unanimous court opinion in *Scindia*, 451 U.S. at 167 and as discussed in Judge Becker's opinion in *Kirsch*, *supra*. at 1028-1029.  The jury was told that the vessel owner had the responsibility:

> [T]o exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Id.* at 167.  As would be directly applicable to plaintiff's theory of the case, we told the jury:

> Thus, if the condition existing when the longshore workers began to work on board the ship is a condition that an expert and experienced stevedore would not by the exercise of reasonable care be able to carry on its cargo operations safely to persons and property, you may find that Defendant has breached its duty of care to Plaintiff . . .

39

*Id.* at 168.

It is difficult to see how this would have resulted in anything other than a plaintiff's verdict if the jury had accepted plaintiff's factual evidence.   There was not the hint of an argument that this rusted grating was an "obvious hazard" and there was certainly nothing suggesting that this "defect" was the result of cargo operations.   The jury had more than plaintiff's scenario to consider.   The charge given did nothing more than provide the framework for the jury to work with in making its factual determinations as to how the injury occurred.

### 3.    *The Refusal to Charge on Active Operations*

The question of whether the court would charge on the defendant's active operations duty was the subject of much discussion during the trial.   The court felt that the applicability of a potential active operations charge was questionable and certainly challenged plaintiff to convince it otherwise.   (*See, e.g.*, *Id.* at 96).   The jury charge had been the subject of several colloquies with counsel, both on and off the record. With respect to the question of charging on active operations, this discussion culminated on September 21, 2006 where Mr. Mattioni, on behalf of the defendant, renewed his objection to the court giving a charge on active operations at all.   (N.T. Sept. 21, 2006 at 94).   As Mr. Mattioni stated, "The plaintiff's theory is simple; the grating is allegedly defective."   *Id.* at 94-95.   The court then directly questioned Mr. Smith on behalf of the plaintiff as follows: "Is there any suggestion from your perspective, Mr. Smith, in the case that anything that was related to, that has any causal relationship to Mr. Coney's injury, occurred during the period that he had, or that the stevedores had come on to the vessel on that particular day up until the time that the injury or accident occurred?"   *Id.* at 96.   Mr. Smith responded simply, "No, sir."   *Id.* at 97.   The court then asked:

All right, well, if that is the case, why is this not simply a turnover

40

> case?  What you're claiming is that the defect, the problem with
> the catwalk existed as of the time that the stevedore came onto the
> vessel that morning.   And whether or not, whether or not
> Hernandez [the vessel's electrician] had access to the catwalk,
> whether or not Hernandez plugged or unplugged reefers, any of
> that business, doesn't have anything to do with Mr. Coney's
> accident.

*Id.*

> Mr. Smith then responded,

> > Your Honor, I've just consulted with Mr. Fine, and he thinks that
> > it's okay for us to withdraw the claim under the active operations
> > theory.

*Id.*

In light of this clear and unequivocal decision made by plaintiff's counsel following immediately upon Mr. Smith's concession that no actions of the crew from the time of turnover to the time of the incident played a part in the accident sequence, it was apparent that plaintiff correctly conceded that the active operations charge was not called for.  As the court observed during the colloquy, the defect which plaintiff claimed caused the accident had to be present at the time of turnover.  The suggestion plaintiff makes in his brief – that the active operations duty instruction was amply supported by the evidence – is simply incorrect.

*3.*     *The Court's Charge on the Issue of* Res Ipsa Loquitur

Plaintiff claims that it was error for the court to refuse to give a *res ipsa loquitur* charge. (Pl. Supp. Mot. at Point 13).  Plaintiff is mistaken.  Although titled "circumstantial proof of negligence" and not "*res ipsa loquitor*," this charge was, in fact, included in the court's charge to the jury without any substantial change from the charge proposed by plaintiff in his Supplemental Points for Charge filed September 5, 2006.  (Compare Doc. 116, p. 15 with N.T. September 21, 2006 at 169-170).   There was no error.

41

4.        *The Court's Charge Relating to Circumstantial Evidence*

Plaintiff has also alleged without further clarification that "[t]he Court erred in its charge

relating to circumstantial evidence." (Pl. Supp. Mot. at Point 14). At trial, the court gave the

following charge to the jury concerning circumstantial evidence:

> Now you've have heard the terms and you will further hear terms,
> direct evidence and circumstantial evidence. I want to make a
> few comments to you about that, those different types of
> evidence.
>
> Direct evidence is evidence like the testimony of an eyewitness
> which, if you believe it, directly proves a fact. If a witness testify
> [sic] that she saw it raining outside and you believed it, that
> would be direct evidence that it was raining.
>
> Circumstantial evidence is a chain of circumstances that indirectly
> proves a fact, or if you're satisfied may prove a fact. If someone
> walked into the courtroom wearing a raincoat covered with drops
> of water and carrying a wet umbrella, that would be
> circumstantial evidence from which you could conclude that it
> was raining outside.
>
> Now, it's your job to decide how much weight to give the direct
> and circumstantial evidence. The law makes no distinction
> between the weight that you should give to either one. Nor does
> it say that one is any better evidence than the other. You should
> consider all the evidence, both direct and circumstantial, and give
> it whatever weight you feel it deserves.

(N.T. September, 21 2006 at 163-64).

Although slightly abbreviated by the court, this charge is taken from Third Circuit

Model Jury Instruction 1.6, Option 2.[15] Given that there is no substantial difference between the

---

[15] Option 2 is as follows:
>     There are two types of evidence that you may use in reaching your verdict.
> One type of evidence is called 'direct evidence.' An example of 'direct evidence'
> is when a witness testifies about something that the witness knows through his
> own senses – something the witness has seen, felt, touched or heard or did. If a
> witness testified that he saw it raining outside, and you believed him, that would

charge as given and the charge endorsed by the Third Circuit, we find no merit in plaintiff's

contention that the charge was erroneous.

>    5.    *The Court's Consideration of Plaintiff's Proposed Jury Instruction 17*
>          *(Constructive Knowledge)*

Again, without further explanation and not supported by any briefing, plaintiff argues

that it was error for the court to fail to give the constructive knowledge charge he

recommended.  The proposed charge read:

> You may also impute constructive knowledge of a dangerous
> condition or defect to the shipowner if the evidence reveals that
> the hazard has existed for a sufficiently long period of time that
> the defendant upon reasonable inspection should have discovered
> it.

(Doc. 116).

We find no merit in plaintiff's argument.  The court's failure to give this precise charge

did not affect the rights of the parties as this same concept was presented to the jury in another

way.  Specifically, the court's charge on the turnover duty adequately conveyed the notion, as

plaintiff wished us to convey, that a defendant shipowner would be deemed to have constructive

---

be direct evidence that it was raining.  Another form of direct evidence is an
exhibit where the fact to be proved is its existence or current condition.

> The other type of evidence is circumstantial evidence.  'Circumstantial
evidence' is proof of one or more facts from which you could find another fact.  If
someone walked into the courtroom wearing a raincoat covered with drops of
water and carrying a wet umbrella, that would be circumstantial evidence from
which you could conclude that it was raining.

> You should consider both kinds of evidence that are presented to you.
The law makes no distinction in the weight to be given to either direct or
circumstantial evidence.  You are to decide how much weight to give any
evidence.

knowledge of a dangerous condition or defect if it should have known, based upon reasonable

inspection, of its existence.

   6. *The Court's Consideration of Plaintiff's Proposed Jury Instruction 18*
     *(Only One Breach Need be Proved by Plaintiff)*

  Again, without further explanation and not supported by any briefing, plaintiff

argues that it was error for the court to fail to give the "one breach need be proved" charge he

recommended.  The proposed charge read:

> In order to recover in this case Mr. Coney need only prove that
> the shipowner breached one of his duties to him and that breach
> caused his injury.  He does not have to prove that the shipowner
> breached both duties.  The evidence may show that both duties
> were breached, but in order to recover Mr. Coney need only prove
> that the shipowner breached one of its duties.

*Id.*

  In this case, and as agreed to by plaintiff, the court only charged the jury only on the

turnover duty.  As noted above, plaintiff decided during trial that the jury should be charged on

this issue alone and not the active operations duty.  (*See* Section C.2, *supra*).  In that we

concluded that the court's charge in this respect was without error, and given that only one duty

upon which to find defendant liable was presented to the jury, the above requested charge was

applicable.

   7. *The Court's Consideration of Plaintiff's Proposed Jury Instruction 19*
     *(Substantial Factor)*

  Again, without further explanation and not supported by any briefing, plaintiff argues

that it was error for the court to fail to give the substantial factor charge he recommended.  The

proposed charge read:

> A party's negligence by itself, is not enough to impose legal
> responsibility on that party.  Something more is needed: the

> party's negligence must be shown by a preponderance of the
> evidence to be a substantial factor in causing injuries to Mr.
> Coney.

*Id.*

Plaintiff's argument has no merit.  In maritime law and under the Longshore and Harbor

Workers Compensation Act, the notion of proximate cause,[16] as applied in tort law, does not

apply.  *Bludworth Shipyard, Inc. v. Lira*, 700 F.2d 1046, 1050 (5th Cir. 1983).  As the court

noted, "[t]his is because proximate cause analysis in a typical tort case focuses on the question

whether a party . . . should be held legally responsible for *remote* consequences of his acts,"

whereas "[t]he inquiry under the LHWCA is much narrower."  *Id.* (emphasis added).  Under the

LHWCA, "[t]he court's sole function is to determine whether the injury complained of was one

'arising out of' the employment."  *Id.*  "Once causation in fact is established, with only a few

exceptions, the court's function is at an end."  *Id.*  Consequently, a longshore or harbor worker

may recover from the vessel even though the vessel's negligence plays only a small part in

causing the accident and the stevedore's negligence is much more of a contributing cause.  *See*

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, *reh'g denied* 444 U.S. 889

(1979).  Further, the Suggested Jury Instruction under the LHWCA in 3A Kevin F. O'Malley,

Jay E. Grenig, and Hon. William C. Lee, *Federal Jury Practice and Instructions*, § 156.250 (5th

Ed. 2001), titled "Causation," states:

> An injury or damage is proximately [legally] caused by an act, or
> failure to act, whenever it appears from the evidence in the case
> that the act or omission played a part in bringing about or actually

---

[16] Proximate cause "means a cause of damage or injury that played a substantial part in
bringing about the injury or damage.  The injury or damage must have been either a direct result
of or a reasonably probable consequence of the cause and except for the cause the injury or
damage would not have occurred."  8th Cir. Civil Jury Instr. 8.35 (2005).

> causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

As such, the maritime standard of causality is favorable to plaintiff. Whereas proximate cause requires only that the act or omission "played a part" in bringing about the injury, substantial factor requires conduct which is significant or recognizable. *See* Pa. SSJI (Civ.) 3.25 subcommittee note (noting that "substantial factor is '[conduct] that has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense.' This definition does not require any quantification as long as the cause is significant or recognizable. If an event is a significant or recognizable cause, 'it need not be quantified as considerable or large.' Thus, the term 'substantial' means only 'significant.'").

## CONCLUSION

For all of the reasons set out above, the plaintiff's motion and supplemental motion for a new trial is **DENIED**. An appropriate order follows.